# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **HARRISON ROBINSON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-06-S-232-NE** |
| | ) | |
| **KOHLER CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Harrison Robinson, Jr., brought suit against defendant, Kohler Co., Inc., alleging race discrimination under Title VII, 42 U.S.C. § 2000e *et seq*., and under 42 U.S.C. § 1981 when he was terminated from employment. This matter is before the court on defendant's motions for summary judgment (doc. nos. 11 and 15).

### PART ONE

*Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322(1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

### PART TWO

*Summary of Relevant Facts*

Defendant operates a manufacturing facility in Huntsville, Alabama that

produces bathtubs, shower pieces, and other bathroom accessories.[1]  Plaintiff is an

African-American male who was employed by defendant from July 9, 2003 to June

---

[1]*See* doc. no. 17 at 1 (brief in support of second motion for summary judgment).

3, 2004.[2]  Jerry Taylor, the production superintendent at Kohler's Huntsville facility, interviewed and hired plaintiff in 2003.[3]  Plaintiff received an employee handbook and a copy of the plan rules, and signed a form acknowledging his receipt of the employee handbook.[4]  Plaintiff understood that the policies and procedures in the handbook and in the plant rules applied to him during his employment.[5]

Plaintiff was a member of a union.[6]  He began his employment as an operator assistant ("OA") and was later promoted to molding operator ("MO").[7]  MOs are responsible for operating large presses containing dies that mold fiberglass reinforced plastic into bathtubs, shower pieces, and sinks.[8]  The MO on the front of the press "shoots" the press by cutting and weighing the plastic into a "charge" that is then placed in the press either manually or by use of a robot arm or chute.[9]  After the press has molded the plastic into shape, the MO on the back of the press then "deflashes" the piece by cutting off excess material and drilling drain holes where necessary.[10]

In May and June of 2004, Taylor was the production superintendent, and Dave

---

[2]*See id*. at 1-2.

[3]*See* doc. no. 17 at 2.

[4]*See id*.

[5]*See id*.

[6]*See id*.

[7]*See id*.

[8]*See id* at 3.

[9]*See id*.

[10]*See id*.

Lewis and Steve Godfrey were supervisors; all three had supervisory authority over plaintiff.[11]  Plant rule one, titled "General Misconduct," states: "Consideration of the rights of others requires that an associate conduct themselves in a respectable and orderly manner.  Obscene, abusive or threatening language, fighting, interference with fellow associates, engaging in malicious gossip or immoral behavior cannot be tolerated."[12]  Plant rule three, titled "Intentional Disruption of Plant Operation," states:  "Participating in any act or action, physical, verbal, or otherwise, which results in or is intended to bring about disruption of plant operations is non-excusable and will be cause for immediate discharge."[13]  The plant rules also state that "[v]iolators are subject to discharge . . . ."[14]  The employee handbook contains a zero tolerance policy with regard to workplace violence.[15]

Defendant contends that, on Sunday, May 30, 2004, supervisor Godfrey observed plaintiff yelling angrily, waving a drill, and calling co-worker Wray Holt, who has red hair, a "red-headed mother f- - - er."[16]  When Godfrey asked plaintiff what was going on, plaintiff pointed with the drill he was holding toward the front of

---

[11]*See* doc. no. 17 at 3.

[12]*Id*. at 4.

[13]*Id*.

[14]*Id*.

[15]*See id*.

[16]*Id*.  Plaintiff denies that this occurred.  *See* doc. no. 21 at 4.

4

the press where Holt was standing, and yelled something Godfrey could not understand.[17]   Another co-worker, Marcus Smith, told Godfrey that plaintiff yelled at Holt from the back of the press, telling him to slow down the press and "blow it out," claiming that he was getting "bad parts."[18]   "Blowing out" the press refers to the process of using an air hose to remove excess flash from the press; if such material is in the die in the press, it can disrupt the production process and result in defective tubs.[19]

When Holt kept running the press, plaintiff went around to the front of the press and began yelling and cursing at Holt, again telling him to slow down the press and to blow it out.[20]   Holt told plaintiff that he should worry about the back of the press, and that he (Holt) would worry about the front of the press.[21]   Defendant contends that plaintiff became angry and said to Holt, "I guess you do not know who the f- - - I am" and "I will see you at the Shell station after work"— words meant to challenge Holt to a fight.[22]

Godfrey asked plaintiff, Holt, co-worker Marcus Smith, packaging operator

---

[17]*See* doc. no. 17 at 4.

[18]*Id*. at 5.

[19]*See id*.

[20]*See id*.  Plaintiff denies that he yelled in anger or cursed at Holt.  *See* doc. no. 21 at 5.

[21]*See* doc. no. 17 at 5.

[22]*Id*.  Plaintiff disputes this account, and asserts that Holt was the one who said, "I will see you at the Shell station after work."  Doc. no. 21 at 5.

Dexter Smith, MO Tim Defoe, and union shop steward Chris North to meet with him and fellow supervisor Dave Lewis.[23]  In that meeting, Holt told Lewis and Godfrey that plaintiff had become angry with him (Holt) and threatened him, while he as working on the front of the press.[24]  Plaintiff indicated that Holt had not threatened or become angry with him (plaintiff).[25]  No witness heard Holt threaten plaintiff.[26]  Dexter Smith and Defoe saw plaintiff and Holt in an argument, but could not be more specific.[27]  During the meeting, Holt was calm, but plaintiff was very upset.[28]  Plaintiff became loud, and accused Lewis and Godfrey of trying to "frame" him.[29]  Lewis and Godfrey suspended both plaintiff and Holt pending an investigation of the incident.[30]

Taylor began an investigation of the incident two days later, on June 1, 2004, by reviewing written witness statements, interviewing witnesses, talking to his supervisors Lewis and Godfrey, and interviewing plaintiff and Holt.[31]  Marcus Smith

---

[23]*See* doc. no. 17 at 6.

[24]*See id.*

[25]*See id.*; *see also* doc. no. 16, Exh. 1, Robinson Depo. at 154.  Plaintiff attempts to dispute this fact, but cites portions of the record that do not support his assertion.  *See* doc. no. 1 at 5, ¶ 30.

[26]*See* doc. no. 17 at 6.

[27]*See id.*

[28]*See id.*

[29]*Id.*

[30]*See id.*

[31]*See id* at 6-7.

told Taylor that he had informed Holt the press did not need to be "blown out" because they were not getting any defective tubs as a result of flash in the die.[32]  It was Marcus Smith's responsibility to repair defective parts and direct the press crew as to when production should be slowed down, or the press "blown out."[33]

An attempt to improperly slow down the production process is a serious matter at Kohler, because the Huntsville facility has very strict production quotas on each press for each shift; not meeting production quotas can delay production of other parts and, ultimately, delay shipment of orders.[34]  Improperly slowing down production also results in additional labor costs, and lowers the profit margin on a particular order, because Kohler's Huntsville facility produces its products to order, making it very important that production quotas are met so that shipments go out in a timely fashion and business is not lost.[35]

Marcus Smith also told Taylor that, later during the May 30th shift, plaintiff became angry with him (Smith) because he (Smith) would not allow plaintiff to rotate to the front of the press.[36]  During a shift, MOs commonly rotate between working the

---

[32]*See id*. at 7.

[33]*See* doc. no. 17 at 7.

[34]*See id.*

[35]*See id*.

[36]*See id*.

7

front and back of the press, although it is not required.[37]  Marcus Smith told plaintiff that he could not rotate because he had indicated at the beginning of the shift that he (plaintiff) did not want to rotate.[38]  Smith claims that plaintiff then said he had a 9 millimeter gun, and "you [Smith] don't know who you're messing with."[39]

Taylor also spoke with Godfrey, Lewis, and Holt, and reviewed the written statements of Defoe and Dexter Smith.[40]  Taylor conducted a meeting in his office with plaintiff and union representative Chris Crowell.[41]  In this meeting Crowell did most of the talking, and argued that, based on plaintiff's work record, Kohler should not terminate him.[42]  Taylor decided to terminate plaintiff for violating plant rules one and three.[43]  Based on his evaluation of the evidence, Taylor concluded that plaintiff initiated the incident by confronting and yelling at Holt, threatened Holt and Marcus Smith, and improperly attempted to slow down the production process.[44]

Prior to this instance, plaintiff had never been disciplined by Kohler.[45]  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

---

[37]See id. at 8.

[38]See doc. no. 17 at 8.

[39]Id.  Plaintiff denies saying this.  See doc. no. 21 at 5.

[40]See doc. no. 17 at 8.

[41]See id.

[42]See id.

[43]See id. at 3.

[44]See id. at 8-9.

[45]See doc. no. 21 at 11.

on November 29,2004, and an amended charge on January 25, 2005.[46]  Plaintiff

received his notice of right to sue on November 1, 2005.[47]

## PART THREE

*Discussion of Plaintiff's Race Discrimination Claim*

When evaluating employment discrimination claims supported by

circumstantial evidence, courts are guided by the analytical framework announced in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792(1973), and elaborated in *Texas*

*Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  Under that now familiar

framework, the plaintiff bears the initial burden of establishing a prima facie case of

discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at

253-54 & n.6.  "The effect of the presumption of discrimination created by

establishment of the prima facie case is to shift to the employer the burden of

producing legitimate, non-discriminatory reasons for the challenged employment

action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing

*McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  To rebut the

presumption of intentional discrimination raised by a plaintiff's demonstration of a

prima facie case, "the defendant must clearly set forth, through the introduction of

---

[46]*See id.*

[47]*See* doc. no. 21 at 11.

admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255.  If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.  The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529**.**  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

To establish a *prima facie* case of racial discrimination in the termination of employment, plaintiff must show that (1) he is a member of a protected class, (2) his employment was terminated, (3) the employer treated similarly situated employees outside of his protected class more favorably, and (4) plaintiff was qualified to perform the duties of his job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).

Defendant moves for summary judgment arguing that plaintiff cannot satisfy the third prong, because he cannot prove that he was treated differently than non-African-American employees.[48]  Plaintiff points to Holt, a Caucasian, as identically situated to him, because they both were involved in the altercation, both were asked for their individual accounts, and both were sent home pending further investigation.[49]  Defendant counters that Holt is not similarly situated, because his conduct was vastly different from that of plaintiff.  After a thorough investigation conducted by Taylor, the same supervisor who hired plaintiff, defendant concluded that Robinson threatened co-workers and slowed down production.  Holt did not do these things.  Although plaintiff now claims that Holt spoke angrily to him, and challenged him to a fight, the summary judgment evidence indicates that these facts

---

[48]*See* doc. no. 17 at 15.

[49]*See* doc. no. 21 at 15.

were never presented to Taylor.[50]  Plaintiff's union steward, Chris North, recalled that, when interviewed by supervisors immediately after the incident, plaintiff admitted that Holt had not threatened or become angry with him.[51]  Plaintiff even indicated during the investigation that Holt had not threatened or become angry with him.[52]  Even if plaintiff now claims a different version of the facts, the integrity of the investigation conducted by Taylor has not been challenged by the evidence submitted by plaintiff.  After a thorough investigation, Taylor relied on his own observations and chose to believe a version of events corroborated by more than one witness.

The court's focus is not on whether the decision to terminate plaintiff's employment was correct, but rather, whether it was motivated by unlawful discriminatory animus.  *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  The evidence presented at this stage of the proceedings indicates a legitimate investigation into the incident between Holt and plaintiff, conducted by Taylor — who not only hired plaintiff, but had shown no pattern or history of racial discrimination, and had never used a racial slur, or acted in a unprofessional manner.  The evidence does not even create a fact dispute as to

---

[50]*See* doc. no. 22 at 6 n.3 (citing Taylor Decl. ¶ 13).

[51]*See id.* (citing Taylor Decl. ¶ 9, Ex. B p. 2; North p. 2).

[52]*See* doc. no. 17 at 6;  *see also* doc. no. 16, Exh. 1, Robinson Depo. at 154.  As previously mentioned, plaintiff attempts to dispute this fact, but cites portions of the record that do not support his assertion.  *See* doc. no. 1 at 5, ¶ 30.

12

whether Holt and plaintiff were similarly situated, or whether the decision to terminate plaintiff was a pretext for discrimination. Although plaintiff points out that he had never been reprimanded or written up for any violation prior to the incident that led to his termination, nothing prevents an employer from having a zero-tolerance policy concerning workplace threats of violence. Upon consideration of the submissions of the parties, the court finds that defendant's motion for summary judgment is due to be granted.

## PART FOUR

### *Conclusions and Orders*

For the foregoing reasons, defendant's second motion for summary judgment (doc. no. 22) is GRANTED, defendant's first motion for summary judgment (doc. no. 11) is DENIED AS MOOT, and plaintiff's case is dismissed with prejudice. Costs are taxed against plaintiff, and the clerk is directed to close this file.

DONE this 21st day of September, 2007.

_____
United States District Judge